CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

APR 24 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **RANDALL T. FORD,**<br>Plaintiff,         ) | Civil Action No. 1:04cv00063 |
| ) | |
| v.         ) | **MEMORANDUM OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,**[1]   ) | |
| **Commissioner of Social Security,** ) | BY: GLEN M. WILLIAMS |
| Defendant.       ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further consideration consistent with this Memorandum Opinion.

### I. Background and Standard of Review

The plaintiff, Randall T. Ford, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Ford's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ford filed his application for DIB on or about July 29, 1996, alleging disability as of October 15, 1995, based on degenerative joint disease, Meniere's disease,[2] asthma with restrictive pulmonary disease, dysthymia disorder, pes cavus[3] with hammer digits, sinusitis, fibromyositis, limited motion of the dorsal spine and temporomandibular joint disease, ("TMJ"). (Record, ("R."), at 55-58, 69.) The claim was denied initially and upon reconsideration. (R. at 34-41, 43-44.) Ford then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 46.) The ALJ held a hearing on January 16, 1998, at which Ford was represented by counsel. (R. at 540-66.)

---

[2]Meniere's disease is characterized by hearing loss, tinnitus and vertigo resulting from nonsuppurative disease of the labyrinth of the inner ear with the histophathologic feature of endolymphatic hydrops. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 489 (27th ed. 1988.)

[3]Pes cavus is the exaggerated height of the longitudinal arch of the foot, present from birth or appearing later because of contractures or disturbed balance of the muscles. *See* Dorland's at 1267.

2

## A. The First ALJ's Decision

By decision dated March 25, 1998, the ALJ denied Ford's claim. (R. at 17-27.) The ALJ found that Ford met the disability insured status requirements of the Act for DIB purposes on October 15, 1995, and continued to meet them through the date of the decision. (R. at 25.) The ALJ further found that Ford had not engaged in substantial gainful activity since October 15, 1995. (R. at 25.) The ALJ found that the medical evidence established that Ford suffered from severe impairments, namely lumbar osteoarthritis, fibromyositis, anxiety/depression, Meniere's disease and asthma, but he found that Ford did not have an impairment or combination of impairments listed or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) The ALJ also found that, although Ford had a history of TMJ, it did not significantly limit his ability to perform basic work-related functions on a sustained basis, and, therefore, it was not severe. (R. at 25-26.) The ALJ found that Ford's subjective allegations were not supported by the objective medical evidence and were not credible. (R. at 26.) The ALJ concluded that Ford retained the residual functional capacity to perform light work,[4] diminished by his need for a sit/stand option, his inability to engage in intense ongoing interpersonal interaction with others, his inability to work around unprotected heights or dangerous machinery and his inability to work around excessive dust, gases, fumes, smoke or other airborne pollutants or irritants. (R. at 26.) Therefore, the ALJ found that Ford was unable to perform his past relevant work. (R. at 26.) The ALJ further found that Ford was a younger individual with a

---

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b) (2007). If an individual can perform light work, he can also perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

3

high school education and no transferable skills. (R. at 26.) Based on Ford's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy which Ford could perform, including jobs as an electrical equipment worker, a marker and a small production assembler. (R. at 26.) Thus, the ALJ found that Ford was not under a disability as defined by the Act, and therefore, he was not eligible for DIB benefits. (R. at 26-27.) *See* 20 C.F.R. § 404.1520(f) (2007).

After the ALJ issued his opinion, Ford pursued his administrative appeals, (R. at 14-15), but the Appeals Council denied his request for review. (R. at 10-13.) On November 28, 2000, the Appeals Council vacated its prior decision and considered additional evidence. (R. at 6-9.) Nonetheless, the Appeals Council again denied Ford's request for review. (R. at 6-7.) Ford then filed an action seeking review of the ALJ's unfavorable decision. *See* Civil Action No. 1:00cv00174. On January 30, 2002, United States Magistrate Judge Pamela Meade Sargent entered a Report and Recommendation, finding that substantial evidence did not exist in the record to support the Commissioner's finding as to Ford's mental residual functional capacity and also finding that substantial evidence did not exist in the record to support the Commissioner's finding that Ford was not disabled. (R. at 671.) The Magistrate Judge recommended that the claim be remanded to the Commissioner for further development. (R. at 671.) On February 20, 2002, United States District Judge James P. Jones adopted the Report and Recommendation, and the case was remanded to the Commissioner pursuant to "sentence four" of 42 U.S.C. § 405(g) for further consideration and development consistent with the Magistrate Judge's Report and Recommendation. (R. at 647.)

4

After remand, a second disability hearing was held before an ALJ on August 12, 2002, at which Ford was represented by counsel. (R. at 645, 826-65.)

## B. The Second ALJ's Decision

By decision dated October 19, 2002, a second ALJ denied Ford's claim. (R. at 626-40.) The ALJ found that Ford met the disability insured status requirements of the Act for DIB purposes on October 15, 1995, and continued to meet them through September 30, 2001. (R. at 639.) The ALJ further found that Ford had not engaged in substantial gainful activity since October 15, 1995. (R. at 639.) The ALJ determined that the medical evidence established that Ford suffered from severe impairments, but he found that Ford did not have an impairment or combination of impairments listed or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 639.) The ALJ also found that Ford's subjective allegations were not entirely credible. (R. at 639.) The ALJ concluded that Ford retained the residual functional capacity to perform light work in a well-defined structured setting not requiring frequent ongoing interpersonal relationships, work which would allow him to alternate between standing and walking, work not requiring crouching or crawling, work not inconsistent with a limited ability to push, pull or hear and work not requiring exposure to any environmental irritants. (R. at 639.) Therefore, the ALJ found that Ford was unable to perform his past relevant work. (R. at 639.) The ALJ further found that Ford was a younger individual at the time of his alleged onset date but was now an individual closely approaching advanced age with more than a high school (or high school equivalent) education with no transferable skills. (R. at 639.) Although the ALJ found that Ford could not perform the full range of light work, using the

5

Medical-Vocational Rules 202.14 and 202.21 as a framework, the ALJ found that there were a significant number of jobs in the national economy which Ford could perform, including jobs as a factory assembler or inspector. (R. at 640.) Thus, the ALJ found that Ford was not under a disability as defined by the Act, and therefore, he was not eligible for DIB benefits. (R. at 640.) *See* 20 C.F.R. § 404.1520(f) (2007).

After the ALJ issued his decision, Ford filed exceptions to the ALJ's decision with the Appeals Council and submitted additional medical records for the Appeals Council to consider. (R. at 614-25.) However, the Appeals Council determined that Ford had not timely filed the exceptions, thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d) (2007). (R. at 567-68.) Thereafter, Ford filed this action seeking review of the ALJ's unfavorable decision. After the parties filed cross motions for summary judgment, a motion to remand was filed by Ford, and this court remanded the case to the Appeals Council because substantial evidence did not support the Appeals Council's determination that Ford's exceptions were untimely filed. (Docket Item No. 20.) After reconsideration, the Appeals Council found no reason to assume jurisdiction, thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984 (2007). (R. at 866-69.) On August 8, 2007, Ford filed a motion to reinstate his claim before this court, and on August 9, 2007, United States Magistrate Judge Pamela Meade Sargent granted Ford's motion. (Docket Item Nos. 21 and 22.) The case is currently before the court on Ford's Motion For Summary Judgment filed on January 11, 2008, and on the Commissioner's Motion For Summary Judgment filed on April 14, 2008.

6

## II. Facts

Ford was born on February 8, 1952, (R. at 55), which, at the time of his onset date classified him as a "younger person" under 20 C.F.R. § 404.1563(c), and at the time of the second ALJ's opinion classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Ford has a high school education, and he has completed some military, police and canine training. (R. at 73.) At the time of Ford's first hearing, Ford was attending Appalachian State University. (R. at 544.) At the time of Ford's second hearing, Ford had received a bachelor's degree in business administration. (R. at 831.) Ford has past relevant work experience as a military police officer and a correctional officer. (R. at 73.)

### A. Ford's First Hearing

At Ford's first hearing before an ALJ, on January 16, 1998, Ford testified that he finished high school and had "some college" education. (R. at 543-44.) Ford stated that he attended various institutions after finishing high school and serving in the military and that, at the time of the hearing, he was taking 13 credit hours at Appalachian State University, working toward a degree in business. (R. at 544-45.) He testified that he attended class about nine or ten hours on Tuesday and Thursday and two hours on Monday, Wednesday and Friday. (R. at 545.) Ford noted that he had completed about 90 credit hours toward a bachelor's degree in business, and that he was considered a senior. (R. at 545.) Ford further testified that he served in the military from April 27, 1973, through July 12, 1990, as a military policeman and later as a military police dog handler. (R. at 545-46.) Ford

7

stated that he had to lift and carry backpacks and M-16's, and that he had to restrain people while working as a military policeman. (R. at 547-48.) He stated that his job as a military police dog handler required him to carry dogs and restrain them. (R. at 548.) Ford testified that he last worked as a corrections officer for the State of Tennessee for a little less than five years, beginning in December 1990, before being fired for making derogatory remarks about his supervisors. (R. at 546-47.) Ford testified that he was unsure if he made derogatory remarks, but believed that he did "because [he] can get kind of out of hand at times." (R. at 547.) Ford testified that his job as a corrections officer required him to be on his feet most of the time, to subdue unruly inmates, to carry injured inmates, to break up fights and to place restraints on inmates. (R. at 546-47.) He further testified that the job involved patrol duties and miscellaneous other duties, and that the job caused a lot of stress. (R. at 547.) He testified that he last worked on October 18, 1995. (R. at 546.)

Ford testified that mental problems have prevented him from working since October 15, 1995, including difficulty concentrating, difficulty controlling anger, aggressive behavior, destructive behavior, feelings of fright and suicidal ideations. (R. at 548, 554.) Ford testified that he suffered from mental problems that dated back to his childhood. (R. at 548, 550.) Ford further testified that, at times, he would withdraw and have crying spells. (R. at 548.) Ford stated he had trouble communicating with people, and he avoided being around people in order to avoid conflict. (R. at 550-51.) Because of these problems, Ford stated that he seldom visited family or friends. (R. at 552.) Ford also testified that he had an abusive father who would "get mad and go off at anything and beat [him] and throw things at [him]." (R. at 550.) Ford further stated that he had violent tendencies and had

8

trouble sleeping. (R. at 551.) Ford remarked that he was hospitalized for three days at Laughlin Air Force Base because of a suicide threat. (R. at 551.) He testified that he continued to have suicidal thoughts even though he had been taking medication for his nerves since approximately 1985. (R. at 551-53.)

Ford testified that it was difficult for him to open doors, sit or perform housework. (R. at 548.) Ford testified that he had pain in his shoulders, neck and lower back, and he stated that he experienced muscle cramping. (R. at 548.) To relieve the pain, Ford testified that he would lie down and restrict his movement. (R. at 549.) He further testified that he took prescription medications, analgesic balms and hot showers in an effort to relieve his pain. (R. at 549.) Ford testified that he suffered from Meniere's disease, characterized by dizziness, a staggering effect, pressure headaches, nausea and a tingly pressure feeling in his head. (R. at 549.) He stated that he often staggered and that dizziness caused him to lose his balance and fall at times. (R. at 549.) Ford further testified that he suffered from pes cavus with hammer digits. (R. at 550.) He stated that he had suffered stress fractures of both heels, had worn prosthetics in the past and had surgery on his right toe. (R. at 550.) He stated that his feet hurt, that he had joint pain and that he had difficulty walking. (R. at 550.) Ford testified that he had trouble reading textbooks because of his neck and shoulder pain. (R. at 552.) Ford testified that he suffered from TMJ, characterized by locking of his jaw and teeth grinding. (R. at 554.) He testified that the majority of his teeth had been extracted as a result. (R. at 554.)

Ford testified that he had enjoyed fishing, playing racquetball, walking and playing his stereo in the past, but he stated that he had stopped engaging in those

9

activities. (R. at 555.) He testified that noise made him tense and irritable, and he did not enjoy being around other people. (R. at 555.) Ford testified that he was able to drive, although he did so infrequently. (R. at 556.) Ford testified that he wanted to "pick up a computer screen and just throw it" at times when he worked in the computer lab at school. (R. at 555.) Ford also testified that he ignored the other students around him when he was at school, and noted that "[they are] there but [they are] not there." (R. at 555-56.)

William H. Haney, a vocational expert, also was present and testified at Ford's hearing. (R. at 557-65.) Haney was asked to assume a hypothetical individual of Ford's age and education, who could work at the light level of exertion, who required a sit/stand option, who experienced certain emotional problems which would preclude work that involved any intense ongoing interpersonal interactions with others, who was precluded from working around unprotected heights, dangerous machinery or other hazards, who had a history of infrequent asthma and who could not work around excessive dust, gases, fumes, smoke or other airborne pollutants or irritants. (R. at 559.) Haney testified that jobs existed that such an individual could perform, including an electrical equipment worker, a marker and a small products assembler. (R. at 559-60.)

Haney also was asked to assume a hypothetical individual who possessed the physical limitations as described earlier, and who had moderate difficulties in social functioning and who often demonstrated deficiencies of concentration, persistence and pace, which resulted in failure to complete tasks in a timely manner. (R. at 561-62.) Haney testified that if an individual suffered daily from

10

deficiencies of concentration, persistence and pace, then he would not be able to perform the jobs mentioned earlier. (R. at 562.)

Haney was next asked to assume the same hypothetical individual, but who had a fair ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to understand, remember and carry out complex job instructions, to relate predictably in social situations, to behave in an emotionally stable manner, who had a poor or no ability to deal with work stress and who had no ability to maintain personal appearance or demonstrate reliability. (R. at 562-63.) Haney testified that these factors would affect the jobs he mentioned earlier. (R. at 563.)

Haney was then asked to consider a hypothetical individual of the same age, education, work history and physical limitations as set forth in the ALJ's first hypothetical individual, but to also assume that this individual had difficulty adjusting to any routine, regular job and would be irritating and antagonizing to co-workers. (R. at 563-64.) Haney testified that such an individual would have difficulty performing the jobs mentioned above. (R. at 564.)

Haney was next asked to assume the same individual, but to consider that this individual was one who had a fair ability to function, who was seriously limited, but not precluded, in his ability to follow work rules, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to maintain personal appearance, to relate predictably in social situations and to demonstrate reliability, who had a poor or no ability to behave in an emotionally

11

stable manner, to deal with work stress, to deal with the public and to relate to co-workers. (R. at 564.) Haney testified that he was unsure whether the areas in which such an individual was rated as having poor to no ability would preclude the individual from working. (R. at 565.)

## B. Ford's Second Hearing

At Ford's second hearing before an ALJ, on August 12, 2002, Ford testified that he received a "combined rating in 90 percent, from the [Department of Veteran's Affairs Medical Center, ("VA"),]" and that he received disability from the State of Tennessee. (R. at 830.) Ford testified that he completed four years of college and received a bachelor's degree in business administration in May 1999. (R. at 831.) Ford also testified that he received specialized training in the military and in law enforcement. (R. at 831.) Ford testified that he last worked in October 1995 as a correctional officer at Northeast Correctional Center, where he worked for approximately five years. (R. at 831-32.) As a correctional officer, Ford had to physically control unruly prisoners, stand or sit for long periods and lift or carry items weighing up to 35 pounds. (R. at 832-33.) He also testified that he worked as a military policeman before working as a correctional officer. (R. at 832.) As a military policeman, Ford also had to control unruly individuals, and, in addition, he controlled police dogs, had to sit and stand and lift or carry dogs that weighed up to 120 pounds. (R. at 832-33.)

Ford testified that since October 1995, he often became frustrated and lost control of his behavior. (R. at 833-34.) He testified that:

12

> It's like things start getting into a spin. And, like – say like, if you're
> in front of [a] computer, you just want to pick up that computer screen
> and just throw it across the room and throw it down on the ground,
> and stomp on it. Or if you had a bat or something, you want to break
> something up. You feel violent.

(R. at 833-34.) He also testified that walking bothered him because of past stress fractures, hammer digit toes and Meniere's disease, which caused him to have trouble with his balance. (R. at 833.) Ford also stated that his back hurt when he bent over to load the dishwasher, placed clothes in the washing machine or dryer and when he changed the linens on his bed. (R. at 834-35.) He remarked that his back hurt him daily, particularly when he did any lifting or moving. (R. at 835.) Ford noted that he had to use a "hand truck" to help him move things around and that he had to improvise in other ways to be able to carry on with daily activities. (R. at 835.) Ford testified that he experienced "shooting pains that run down the legs," cramps and stabbing pains. (R. at 836.) Ford also stated he could sit up to 30 minutes at a time without experiencing pain or discomfort, and explained that he rested or lied down about 70 percent of the time. (R. at 836.) Ford testified that he had hand pain and had to write with "fat" pens in order to relieve his pain. (R. at 837.) Ford further remarked that his Meniere's disease caused him to have an unsteady gait and caused him to fall at times. (R. at 837.) During the hearing, the ALJ questioned Ford about bumps on his arm, and Ford explained that he picked at his arm because of nervous habits and that his bumps bleed and have caused scars. (R. at 838.)

Ford described his emotional behavior as hostile with intermittent feelings of anger, fear and sadness, accompanied by crying spells. (R. at 838-39.) Ford stated that:

13

It's just like I stay home, I don't go anywhere. I keep the doors
closed, the drapes closed and that. I keep two loaded handguns, in the
house. And even if I'm out somewhere, I get to thinking, you know,
from being in military, I get to thinking you know, like an M-16. I
almost feel like I need one, but I know that − I don't why. It's almost
if some enemy is going to come out and get you ... and a lot of this
stuff can change rapidly, back and forth . . . And I just can't explain it.

(R. at 838-39.) Ford stated that he had trouble focusing, reading, comprehending
and maintaining concentration. (R. at 839.) He said he was able to complete
college classes by not giving up and by continuing to try. (R. at 839-40.)

Ford stated that he attended a weekly group therapy session at the VA. (R.
at 840.) He said that he visited with a psychiatrist at the VA every three or four
months. (R. at 840.) Ford testified that he had sought treatment for emotional
difficulties since 1984. (R. at 841.) Ford testified that he counted his steps at
times for no reason at all, that he continually washed his hands, that he chewed on
his fingernails and that he had to attend psychological counseling to be able to
wear dentures, which was unsuccessful. (R. at 841-42.) Ford testified that his
symptoms had worsened, and that he tried to avoid public places. (R. at 843.)

Theron Blickenstaff, M.D., a medical expert, also testified at Ford's hearing.
(R. at 844-46.) Dr. Blickenstaff noted numerous medical diagnoses in the record,
including degenerative disc disease, Meniere's disease, asthma, gout,
hypothyroidism, obesity, vertigo and back and foot pain. (R. at 845.) He testified
that none of Ford's conditions, singly or in combination, met or equaled a listing.
(R. at 845-46, 858.) Dr. Blickenstaff testified, however, that Ford would have

14

limitations on sitting, standing, walking, operating hazardous machinery, climbing and working at heights. (R. at 858.)

Margaret Robbins, M.D., a medical expert, also testified at Ford's hearing. (R. at 846-49.) Dr. Robbins noted that Ford had a personality disorder that would limit his upward mobility. (R. at 848.) She testified that Ford would require ongoing treatment for his personality disorder, but that in a structured setting he would be able to complete some tasks, similar to tasks he has previously completed during his prior work. (R. at 848.) Dr. Robbins stated that Ford would require support, but that he would have conflicts with individuals at work. (R. at 849.) When asked if Ford's impairments would equal or meet a listing, Dr. Robbins explained that the answer to that question depended on Ford's credibility. (R. at 849.) Dr. Robbins also testified that Ford's emotional difficulties would be impacted differently in different work settings, and that his improvements made in group therapy may be due to his current status of not working. (R. at 860-61.) Dr. Robbins noted that Ford previously worked with personality factors that were at least as equal to his current problems, but that she could not determine how his current problems would affect him until she was able to observe him in a work setting. (R. at 861-62.)

Norman Hankins, Ed.D., a vocational expert, also testified at Ford's hearing. (R. at 849-57.) Hankins described Ford's past relevant work as a military policeman as skilled work requiring medium[5] to heavy[6] exertion, and he classified

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. *See* 20 C.F.R. § 404.1567(c) (2007). If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

Case 1:04-cv-00063-GMW-PMS   Document 38   Filed 04/24/08   Page 15 of 43   Pageid#: 208

Ford's past relevant work as a correctional officer as semiskilled work requiring medium to heavy exertion. (R. at 851.) Hankins stated that Ford had no transferable skills. (R. at 851.) The ALJ asked Hankins to assume a hypothetical individual of Ford's age, education and work experience who could perform the exertional limitations set forth in Exhibit 6F.[7] (R. at 851-52.) Hankins testified that the hypothetical individual would be able to perform light work, with a limitation on standing or walking for more than four hours. (R. at 852.) Hankins testified that the hypothetical individual would be able to perform work as a gate guard, a gate tender, a watchman and factory jobs such as an assembler or an inspector. (R. at 852.) Hankins testified that there would be a significant number of jobs in the national and regional economies for such an individual. (R. at 852-53.)

The ALJ further asked Hankins to assume a second hypothetical individual who possessed all the limitations as the first hypothetical, and, in addition, possessed the limitations noted in Dr. Robbins's testimony. (R. at 853.) Hankins testified that such an individual would still be able to work as an assembler or an inspector and that there would be a significant number of jobs in the national and regional economies for such an individual. (R. at 853.)

---

[6]**Error! Main Document Only.**Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carry of items weighing up to 50 pounds. *See* 20 C.F.R. § 404.1567(d) (2007). If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2007).

[7]Exhibit 6F includes a letter by Dr. Muhammad R. Javed, M.D., written to Ford's counsel, describing Ford's impairments, and the exhibit is accompanied by a Physical Assessment Of Ability To Do Work-Related Activities. (R. at 411-16.)

Lastly, the ALJ asked Hankins to assume a third hypothetical individual with Ford's age, education and work experience, and to further assume that such an individual would have the limitations that Ford testified to, assuming that Ford's testimony was credible and reliable. (R. at 853-54.) Hankins testified that such an individual would be limited to semi-sedentary[8] work and would not be able to work on a regular basis. (R. at 854.)

Ford's counsel next asked Hankins to evaluate what impact the limitations in Exhibit 6F would have on light work. (R. at 854.) Hankins noted that the limitations in Exhibit 6F would eliminate more than 50 percent of the light work jobs available to Ford. (R. at 854.) When also asked to assume the limitations in Exhibit 8F,[9] Hankins testified that Ford would not be able to work. (R. at 855.) Ford's counsel next asked Hankins to evaluate what impact the limitations in Exhibit 7F[10] would have on Ford's ability to perform work. (R. at 855-56.) Hankins testified that Ford would not be able to work with the limitations described in Exhibit 7F. (R. at 856.) Hankins also testified that the limitations described in Exhibits 11F[11] and 14F,[12] or Exhibit 1F,[13] or Exhibit 3F,[14] or Exhibit 15F[15] would prevent Ford from performing work.[16] (R. at 856-60.)

---

[8]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* C.F.R. § 404.1567(a) (2007).

[9]Exhibit 8F is a letter by Dr. Russell D. McKnight, M.D., written to Ford's counsel, describing Ford's physical and mental impairments. (R. at 424-25.)

[10]Exhibit 7F contains a psychological evaluation report completed by Sharon Hughson, Ph.D., along with a form entitled, "Medical Assessment of Ability To Do Work-Related Activities," which provides an assessment of Ford's ability to do work based on his mental and emotional capabilities. (R. at 417-23.)

[11]Exhibit 11F is a psychiatric evaluation completed by Dr. Nasreen Dar, M.D. (R. at 797-

17

## C. Medical Evidence

In rendering his decision, the first ALJ reviewed records from the VA; Dr. Sandra Buchin, M.D., a state agency physician; Charles L. Johnson Jr., Ph.D., a state agency psychologist; Dr. Steven Salmony, Ph.D., a state agency psychologist; Harry G. Padgett, Ed.D.; Dr. Charles P. Scheil, M.D.; Dr. Khaja M. Ahsanuddin, M.D.; Dr. Russell D. McKnight, M.D.; Dr. Muhammad R. Javed, M.D.; and Sharon J. Hughson, Ph.D., a licensed clinical psychologist. After the first ALJ's denial of disability benefits, Ford's counsel submitted additional records to the Appeals Council from Caldwell Memorial Hospital; Dr. Nasreen R. Dar, M.D.; and Appalachian State University Comprehensive Clinic.[17] In addition to all

---

800.)

[12]Exhibit 14F is a psychiatric evaluation completed by Dr. Nasreen Dar, M.D., accompanied by a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 811-16.)

[13]Exhibit 1F is a comprehensive mental status report of Ford completed by Harry Padgett, Ed.D. (R. at 128-33.)

[14]Exhibit 3F is a psychiatric examination report of Ford completed by Dr. Khaja Ahsanuddin, M.D. (R. at 128-33.)

[15]Exhibit 15F is a psychological evaluation report of Ford completed by Gary Bennett, Ph.D., accompanied by a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 817-25.)

[16]Ford's counsel also questioned Hankins on the findings in Exhibit 10E in the previous administrative record. While other exhibit numbers mentioned by Ford's counsel matched the current administrative record, the findings in the current Exhibit 10E do not coincide with the findings Ford's counsel mentioned at the hearing. Based on the findings mentioned at the hearing by Ford's counsel, Hankins testified that if Ford "often had deficiencies of concentration and persistence, and pace," Ford would not be able to perform the jobs that Hankins identified at the hearing. (R. at 863.)

[17]Any evidence considered by the Appeals Council in reaching its decision not to grant review will also be considered by this court in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health and Human Servs.*, 953 F.2d 93, 96

18

previous records, the second ALJ reviewed records from Gary T. Bennett, Ph.D. and Dr. Pramod Shah, M.D.

Ford was seen at the various VA facilities from May 1973 through November 1996.[18] [19](R. at 150-410.)  Over this time period, Ford complained of, among other things, metatarsal pain, (R. at 410), right heel pain, (R. at 410), feet pain, (R. at 277, 319, 409), soreness on the bottom of his right foot, (R. at 408), a right ankle injury, (R. at 407), back pain, (R. at 241, 312, 380, 385, 409), asthma and allergic rhinitis, (R. at 216, 291, 396), difficulty breathing, (R. at 392), shoulder pain, (R. at 241, 339, 362, 366, 377-80, 388, 391), ear problems, (R. at 383), a painful nodule on the lower border of the right mandible, (R. at 383), neck pain, (R. at 378, 385), knee pain, (R. at 175-76, 339, 362, 366, 369, 391), overall tiredness and weakness, (R. at 226, 359), low self esteem, (R. at 212, 348, 353), depression and anxiety or stress, (R. at 193, 212, 348, 353-54, 358), suicidal ideations, (R. at 345, 349-52), hyperventilation, (R. at 354), prior child abuse, (R. at 347-48), multiple joint pain, (R. at 187, 221, 226, 291, 310-12, 340), weight problems, (R. at 219, 283, 328, 355), avoidance of social interactions, (R. at 324), hip pain, (R. at 317), decreased hearing, (R. at 273),  ringing in the ears, (R. at 265, 273), dizziness and nausea,  (R. at 250, 265, 273), rib pain, (R. at 256), arthritis, (R. at 239), and shortness of breath, (R. at 216).

---

(4th Cir. 1991).

[18]Many of these treatment notes are illegible.

[19]These records also contain disability evaluations from the VA, which, although considered by this court when looking at the record as a whole, are not as probative as more recent medical and psychological evaluations of Ford's disability.

19

Ford was diagnosed with a right ankle contusion, (R. at 407), a right inguinal hernia, (R. at 406), asthma and allergic rhinitis, (R. at 150, 198-99, 216, 291, 395, 398, 400), muscle strain, (R. at 409), a deviated nasal septum, (R. at 392), vertigo of an undetermined etiology, (R. at 389-90), slight kyphosis of the cervical spine from the C2 level through the C6 level, (R. at 384), a painful lymph node, (R. at 383), tendonitis, (R. at 277, 319, 378-79), cervical spasms, (R. at 378), myofascial pain syndrome, (R. at 327, 339-40, 377), fibromyositis/fibromyalgia, (R. at 198, 216, 226, 240-41, 243-44, 318, 336, 375-76), congenital joint laxity, (R. at 359, 361), obesity, (R. at 283, 318, 361), multi-joint hyperlaxity of a systemic etiology due to no objective findings, (R. at 359), dysthymic disorder, (R. at 172-73, 180, 198-99, 209, 325, 338, 343, 349, 353), mixed personality traits/disorder, (R. at 324, 332, 349, 353), anti-social behavior, (R. at 313, 342), histrionic personality disorder, (R. at 324-25), depression and/or anxiety, (R. at 172, 216, 218, 241, 289, 313), arthralgias, (R. at 321, 373-74), sciatica, (R. at 317), spina bifida at the L5 level, (R. at 312, 314), lower back pain, (R. at 209, 311), adjustment disorder with mixed emotional features, (R. at 296, 298, 306), knee pain, (R. at 175-76, 304), chronic heel pain, (R. at 304), degenerative joint disease, (R. at 187, 199, 209, 216, 226, 240, 243-44, 289, 299), passive-aggressive personality traits, (R. at 296, 298), pes cavus, (R. at 282, 289, 291), musculoskeletal chest pain, (R. at 289), Meniere's disease, (R. at 184, 187, 198-99, 209, 272, 284), dizziness, (R. at 283), tinnitus, (R. at 283), a narrowed and elevated endolymphatic site, high jugular bulb, (R. at 271), abdominal pain, (R. at 245), a borderline hallux valgus configuration of the right foot, (R. at 233), early degenerative cartilaginous changes consistent with arthritic disease in the right foot, (R. at 230-32), TMJ, (R. at 206), neurosis, (R. at 187), hyperlipidemia, (R. at 176), spondylosis, (R. at 152), and arthritis, (R. at 150, 184.). No permanent restrictions were placed on Ford by any physician over this

period. The record shows that during this period Ford was intermittently involved in stress management classes and group therapy. Ford was hospitalized for a two-day period in February 1986 for suicidal ideations. (R. at 348.)

On August 19, 1996, Ford saw Harry G. Padgett, Ed.D., a psychologist, for a psychological evaluation. (R. at 128-33.) Padgett noted that Ford appeared very anxious and tense. (R. at 130.) Padgett further noted that Ford attended Appalachian State University, shopped, drove and watched television. (R. at 131.) Padgett reported that Ford had difficulty sleeping and had a limited social life. (R. at 131.) Ford informed Padgett that his hobby was "lying around and doing nothing." (R. at 131.) Ford reported having experienced depression since high school, and stated that he felt worthless, angry, aggressive and even passive-aggressive at times. (R. at 131.) Ford reported having nightmares about his father and math, and admitted to sporadic suicidal ideations since age 19. (R. at 131-32.) Padgett noted that Ford exhibited generalized anxiety and depression. (R. at 131.) Ford was able to reason logically quite well and read at a post high school level, but he had difficulty with mathematical reasoning. (R. at 132.) Padgett diagnosed Ford with dysthymic disorder and a personality disorder, not otherwise specified. (R. at 132.) Padgett opined that Ford would have difficulty adjusting to any routine, regular job. (R. at 133.) Specifically, Padgett noted that Ford would be irritating to other people and would likely antagonize most co-workers. (R. at 133.)

On September 9, 1996, Ford saw Dr. Charles P. Scheil, M.D., for a disability evaluation, with complaints of back pain and joint pain. (R. at 134-36.) In particular, Ford complained of pain at the base of his neck which radiated into both

21

shoulders and low back pain which occasionally radiated down both legs. (R. at 134.) Dr. Scheil noted that Ford had stiffness upon moving all joints, particularly his neck, shoulders, hips and right knee. (R. at 135.) Nonetheless, Ford had a full range of motion in the upper and lower extremities. (R. at 135.) Straight leg raising was negative. (R. at 135.) Dr. Scheil also noted moderate hammer toes and no active swelling of any joints. (R. at 135.) Ford was diagnosed with osteoarthritis of the lumbar spine with spina bifida at the L5 level of the spine and Meniere's disease by history; he also was diagnosed with fibromyositis, dysthymia and infrequent asthma. (R. at 136.) Dr. Scheil noted that although Ford complained of pain in all spheres of activity, there were no objective findings. (R. at 136.) X-rays taken on March 9, 1996, revealed very small anterior osteophytes in the lower lumbar vertebrae and accentuated parenchymal markings with no infiltrate in the left lateral chest. (R. at 426-27.)

On September 18, 1996, Dr. Sandra Buchin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 96-103.) Dr. Buchin found that Ford could occasionally lift and/or carry items weighing up to 50 pounds and frequently lift and/or carry items weighing up to 25 pounds. (R. at 97.) Dr. Buchin also found that Ford could stand and/or walk and/or sit for a total of six hours in a typical eight-hour workday, and that Ford was unlimited in his ability to push and/or pull. (R. at 97.) Dr. Buchin noted that her findings related to Ford's exertional limitations were based upon Ford's allegations that he experienced pain in all spheres of activity. (R. at 97.) She also noted that Ford had no manipulative, communicative or visual limitations. (R. at 99-100.) Dr. Buchin further found that Ford could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but she found that he could only

occasionally climb ladders, ropes and scaffolds. (R. at 98.) Dr. Buchin noted that Ford should avoid concentrated exposure to hazards such as machinery and heights due to his unsteady gait. (R. at 100.) Dr. Buchin diagnosed Ford with asthma and degenerative joint disease. (R. at 96.)

On September 18, 1996, Charles L. Johnson, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 110-18.) Johnson found that Ford suffered from a severe impairment which did not equal or meet a listed impairment. (R. at 110.) Specifically, Johnson determined that Ford suffered from disturbance of mood, inflexible and maladaptive personality traits, a personality disorder, not otherwise specified, major depression and chronic dysthymia. (R. at 113, 115.) Johnson further found that Ford was only slightly limited in his activities of daily living and never experienced episodes of decompensation in work or work-like settings, but he found that Ford had moderate difficulties in maintaining social functioning and often experienced deficiencies of concentration, persistence or pace. (R. at 117.) Steven Salmony, Ph.D., another state agency psychologist, reviewed Johnson's report and affirmed his findings on January 31, 1997. (R. at 110.)

On September 18, 1996, Johnson also completed a Mental Residual Functional Capacity Assessment, ("MRFC"). (R. at 119-22.) Johnson found that Ford was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers

23

or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (R. at 120.) Johnson opined that Ford should be able to cope with normal job stressors and perform simple or detailed tasks without extensive interpersonal public contact. (R. at 121.) Salmony reviewed Johnson's assessment and affirmed his findings on January 31, 1997. (R. at 121.)

X-rays of Ford's lumbosacral spine, taken on January 6, 1997, revealed spina bifida occulta of the L5 level of the spine, but were otherwise unremarkable. (R. at 787.) On January 14, 1997, Ford saw Dr. Khaja M. Ahsanuddin, M.D., for a psychiatric examination. (R. at 139-42.) At that time, Ford reported that he had experienced depression for over six years, and he also admitted to suicidal ideations. (R. at 140.) Ford reported his daily activities to include occasional cooking, watching television, performing minimal housework and occasional shopping. (R. at 140.) Dr. Ahsanuddin noted that Ford did not appear to be psychotic, his affect was deemed appropriate and he was not manic or hypomanic. (R. at 141.) Ford's personality showed "mixed features," and he showed sustained anxiety and depression. (R. at 141.) Dr. Ahsanuddin diagnosed Ford with late onset dysthymia, pain disorder, possible mild obsessive compulsive disorder, possible mild personality disorder with agoraphobia, mixed feature personality, TMJ, asthma, degenerative joint disease involving the hips, knees and spine, fibromyositis, Meniere's disease and sleep apnea. (R. at 141.) Dr. Ahsanuddin assessed Ford's Global Assessment of Functioning, ("GAF"), score at 50.[20] (R. at

---

[20]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, (DSM-IV), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates that the individual has "[s]erious

24

142.) Dr. Ahsanuddin opined that Ford probably would not improve further in his emotional and/or behavioral level of functioning. (R. at 142.)

On March 7, 1997, Ford saw Dr. Russell D. McKnight, M.D., for a psychiatric evaluation. (R. at 143-46.) At that time, Ford reported suicidal ideations on a daily basis, and he stated that he had attempted suicide at age 16. (R. at 143-44.) Ford further reported constant feelings of violence and explained that he was "explosive" and intolerant of noise. (R. at 144.) Dr. McKnight noted that Ford talked in a coherent and logical manner, but appeared tense, irritable and digressive. (R. at 144.) Dr. McKnight further described Ford as moderately depressed, irascible and belligerent in his tone. (R. at 144.) Dr. McKnight opined that Ford functioned in the normal range of intelligence with no obvious psychotic symptoms. (R. at 145.) Dr. McKnight noted that Ford's typical day involved staying at home and sitting around watching television. (R. at 145.) He also noted that Ford went shopping about once a week. (R. at 145.) Dr. McKnight diagnosed Ford with anxiety/depression with insomnia associated with chronic pain and medical problems, major affective disorder with atypical depression, possible post-traumatic stress disorder, explosive personality features, Meniere's disease, multiple joint osteoarthritis, fibromyalgia and TMJ. (R. at 145.) Dr. McKnight assessed Ford's GAF at 50. (R. at 145.) Dr. McKnight opined that Ford would benefit from strong doses of antidepressant medications, tranquilizers, sleep aids and psychotherapy. (R. at 146.) Dr. McKnight further opined that Ford was not, at that time, suitable for competitive employment, and he found it unlikely that Ford would ever be able to return to gainful employment in the future. (R. at 146.)

---

symptoms . . . OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

25

Dr. McKnight also completed a Mental Assessment Of Ability To Do Work-Related Activities on March 7, 1997. (R. at 147-49.) Dr. McKnight found that Ford had a fair ability to follow work rules, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out simple, detailed and complex job instructions, to maintain personal appearance, to relate predictably in social situations and to demonstrate reliability. (R. at 147-48.) Dr. McKnight further found that Ford had a poor or no ability to relate to co-workers, to deal with the public, to deal with work stresses and to behave in an emotionally stable manner. (R. at 147-48.) Dr. McKnight noted that Ford was irritable, irascible, labile, asocial, had suicidal feelings daily and suffered from depression, chronic fatigue and insomnia. (R. at 148.) However, he found that Ford could manage benefits in his own interests. (R. at 149.)

On June 30, 1997, Ford saw Dr. Muhammad R. Javed, M.D. (R. at 411-13.) Among other complaints, Ford complained of dizziness, unsteady gait, buzzing in his ears, pressure in his ear, pain in both feet, stiffness, arthritis, fibromyositis, bronchial asthma, frequent cough, shortness of breath, being nervous all the time, feelings of uselessness and worthlessness and crying spells. (R. at 412.) Dr. Javed diagnosed Ford with Meniere's disease with associated vertigo, deafness, tinnitus and dizziness, degenerative arthritis, bronchial asthma and depressive neurosis. (R. at 412-13.) Dr. Javed also completed a Physical Assessment Of Ability To Do Work-Related Activities. (R. at 414-16.) Dr. Javed found that Ford could lift and/or carry items weighing up to 20 pounds occasionally and items weighing up to 10 pounds frequently. (R. at 414.) Dr. Javed also found that Ford could stand

26

and/or walk for a total of four hours in an eight-hour workday, but could do so for only up to one hour without interruption. (R. at 414.) Dr. Javed further found that Ford could occasionally climb, stoop, kneel and balance, but he found that Ford could never crouch or crawl. (R. at 415.) Dr. Javed found that Ford's ability to push and/or pull, as well as his ability to hear, were affected by his impairments. (R. at 415.) Dr. Javed also found that Ford was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 416.)

On July 18, 1997, Sharon J. Hughson, Ph.D., a licensed clinical psychologist, completed a psychological evaluation. (R. at 417-21.) Hughson described Ford as "unusual in his presentation," and "somewhat defensive, rather edgy at times." (R. at 417.) Ford reported problems with depression since childhood, and he also reported that he did not care about anything. (R. at 417.) He further described "a rather reclusive desire to stay home." (R. at 417.) Ford admitted to suicidal ideations on the morning of the evaluation, and he admitted to attempting suicide on three separate occasions. (R. at 417-18.) Hughson reported that Ford's antidepressant medications were not working as well as they should because Ford did not take his antidepressant medication on a regular basis. (R. at 418.) Ford reported childhood abuse, an inability to sit for more than 50 minutes, an inability to stand for more than two minutes and hearing problems. (R. at 418.) He also reported prior hospitalizations for appendicitis, skull fracture, nose surgery, Meniere's disease, toe surgery, teeth extractions due to TMJ and suicidal ideations. (R. at 418.) While Hughson noted that Ford remarked, "I envy people who succeed at suicide," she found that he was not suicidal at the present time. (R. at 418.) Ford reported that he was interrupted three times a night with pain and

nightmares, with content of childhood abuse, military life, his prison job and school issues. (R. at 419.) Ford also reported a passive-aggressive personality disorder and stated that he threw things, but was not violent. (R. at 419.) Ford reported managing his own money, watching television, listening to the radio, shopping, cooking, attending college on a fulltime basis and performing housework. (R. at 419.) Ford further reported a fear of crowds, being "anti-establishment" and being an outcast. (R. at 419.) At one point during Hughson's examination, Ford stated that "just being born" was his biggest mistake. (R. at 419.) Although the Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), was administered, Hughson concluded that the profile was not a valid indication of Ford's personality and symptoms because of random responding, falsely claiming psychological problems, a low reading level, "a plea for help" and a confused state. (R. at 420.) Hughson diagnosed Ford with intermittent explosive disorder, post-traumatic stress disorder, pain disorder, major depressive disorder, recurrent, moderate and schizoid personality disorder. (R. at 420.)

On August 26, 1997, Hughson completed a Medical Assessment Of Ability To Do Work-Related Activities. (R. at 422-23.) Hughson found that Ford had an unlimited or very good ability to follow work rules and to understand, remember and carry out simple job instructions; a good ability to function independently, to maintain attention and concentration and to understand, remember and carry out detailed job instructions; a fair ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations; and a poor or no ability to deal with work

28

stresses, to maintain personal appearance and to demonstrate reliability. (R. at 422-23.)

Ford presented to Dr. McKnight on November 13, 1997, for an interim report. (R. at 424.) Dr. McKnight noted that Ford reported upper body pain, chronic low back pain, degenerative arthritis, fibromyositis, irritability, depression, feelings of confusion, poor concentration, poor attention, recurrent bouts of anger, persistent nightmares, continued symptoms from Meniere's disease, tinnitus, nausea, dizziness, vertigo, sinusitis, asthma, carpal tunnel syndrome and asocial and destructive behavior. (R. at 424.) Dr. McKnight described Ford as mildly to moderately depressed, but noted no psychotic features. (R. at 425.) Dr. McKnight diagnosed Ford with anxiety/depression with insomnia associated with chronic pain and medical problems, major affective disorder with atypical depression, post-traumatic stress disorder, explosive personality features, Meniere's disease, multiple joint osteoarthritis, fibromyalgia, TMJ and carpal tunnel syndrome. (R. at 425.) Dr. McKnight assessed Ford's GAF at 50 and opined that Ford would benefit from increased doses of antidepressant medications and tranquilizers. (R. at 425.) Unofficial academic records from Appalachian State University show that as of the Fall 1997 semester, Ford's grade point average was 2.6 and that in Spring 1998 he was scheduled to be in class 11 hours and 20 minutes a week. (R. at 429-42.)

Ford was seen at the VA in Mountain Home, Tennessee, from January 7, 1998, through October 14, 1999. (R. at 463-91.) Over this time period, Ford complained of, among other things, muscle aches or pain, (R. at 464, 474, 485-86, 489, 491), insomnia, (R. at 478, 480, 491), numbness and tingling in his head, (R.

at 491), frustration, (R. at 487), forgetfulness, (R. at 480), decreased appetite, (R. at 478), dizziness and nausea, (R. at 474), snowy vision, (R. at 472), and gout, (R. at 469-71). Ford was diagnosed with fibromyalgia, (R. at 465, 477, 489, 491), Meniere's disease, (R. at 465, 477, 489, 491), high cholesterol, (R. at 465, 483, 485, 491), muscle aches or pain, (R. at 483), arthralgias, (R. at 465, 477, 483), chronic gout, (R. at 471, 482), metatarsalgia, (R. at 482), gouty arthritis of the right toe, (R. at 470), dysthymia, (R. at 467, 478, 480), depression, (R. at 467), and carpal tunnel syndrome, (R. at 463). Non-compliance with taking medications was reported on several occasions. (R. at 474, 478, 480, 489.) Moreover, multiple healthcare professionals urged Ford to exercise or to modify his diet, to no avail. (R. at 464, 470, 472-73.) He stated that he did "not have much interest in eating differently," and that he was unmotivated to change his lifestyle habits. (R. at 470, 473.) Ford attended group therapy sessions during this period. (R. at 463-66.) X-rays of the left foot, taken on December 30, 1998, revealed a high pedal arch, but x-rays of the wrists revealed no bone, joint or soft tissue abnormalities. (R. at 484.) X-rays of the right foot, taken on May 17, 1999, revealed abnormalities of the third, fourth and fifth interphalangeal joints with mild dorsal subluxation and defects and possible erosion of the distal aspect of the fourth and fifth proximal phalanges. (R. at 475.)

Upon referral by his attorney, Ford saw Dr. Nasreen R. Dar, M.D., a psychiatrist, for a psychiatric evaluation on April 9, 1998. (R. at 447-49.) Ford reported joint and muscle pain, dizziness, frequent headaches, fatigue; and that he felt nervous, irritable, had nightmares and lost his temper easily. (R. at 447.) He further reported that he was depressed and wanted to cry, and that he had feelings of hopelessness, helplessness and worthlessness. (R. at 447.) Ford stated that he

30

could not tolerate crowds, loud noises or children. (R. at 447.) He admitted to frequent suicidal thoughts. (R. at 447.) Dr. Dar noted that Ford's affect was depressed, his concentration was impaired and he had a low self-esteem. (R. at 448.) Dr. Dar diagnosed Ford with major depression and Meniere's disease by history. (R. at 448.) Dr. Dar reported that Ford was not able to tolerate much stress, and he did not appear able to handle any gainful employment. (R. at 449.)

Dr. Dar also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 450-51.) Dr. Dar found that Ford had a fair ability to follow work rules, to use judgment, to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 450-51.) Dr. Dar also found that Ford had a poor or no ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex or detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 450-51.)

On November 24, 1998, and December 1, 1998, Ford saw Damaris Shipley-Miltenberger, M.A., CCC-SLP, at Appalachian State University Comprehensive Clinic for a speech and language evaluation, after a learning disability, attention deficit disorder or an auditory processing problem was suspected. (R. at 453-61.) After several tests were administered, Ford was diagnosed with weaknesses in auditory processing and possible attention deficit disorder. (R. at 460.) Nonetheless, Shipley-Miltenberger opined that Ford had learned strategies which lessened the effects of his auditory processing weaknesses. (R. at 460.)

31

Ford was again seen at the VA from October 20, 1999, through February 16, 2000. (R. at 493-504.) During this time period, Ford received individual and group psychotherapy. (R. at 493-500, 502-04.) Ford complained of, and was diagnosed with, foot pain. (R. at 499.) In addition, Ford was given wrist splints for both hands and underwent an irrigation of both ears. (R. at 499, 501, 503.) Ford also admitted frequent noncompliance with medications. (R. at 497.)

On May 16, 2000, Ford again saw Dr. Dar for a psychiatric evaluation. (R. at 506-08.) Ford reported frequent buzzing in both ears, frequent headaches, fatigue, and also noted that he felt nervous, irritable and lost his temper easily. (R. at 506.) He further reported that he was depressed, had a decreased libido and wanted to cry, and that he had feelings of hopelessness, helplessness and worthlessness. (R. at 506.) Ford stated that he could not tolerate crowds, loud noises or children. (R. at 506.) He admitted to frequent suicidal thoughts, and he stated that preferred to be alone. (R. at 506.) Dr. Dar noted that Ford's affect and mood were depressed, his concentration was fair; he had nervous tics and he had a low self-esteem. (R. at 506.) Dr. Dar diagnosed Ford with major depression and physical problems by history. (R. at 506.) Dr. Dar reported that Ford was not able to tolerate much stress, and that he did not appear able to handle any gainful employment. (R. at 506.)

Dr. Dar also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 509-11.) Dr. Dar found that Ford had a fair ability to follow work rules, to use judgment, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 509-11.)

32

Dr. Dar also found that Ford had a poor ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex or detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 509-511.)

Ford was seen at the VA from May 17, 1999, through September 11, 2000. (R. at 513-39.) Over this time period, Ford complained of, among other things, foot pain, (R. at 516), various muscle aches or pains, (R. at 522), and lesions on his skin, (R. at 536). He was diagnosed with pes cavus bilaterally, (R. at 516), degenerative disc disease, (R. at 537), recurrent folliculitis, (R. at 522, 537), hyperlipidemia, (R. at 514, 522, 537), chronic gingivitis, (R. at 524, 531), periodontitis, (R. at 531), Type II diabetes, (R. at 514, 522), fibromyalgia, (R. at 522), and neurosis, (R. at 538). Ford also received individual and group psychotherapy. (R. at 513, 515-24, 530-36, 538-39.) On March 2, 2000, it was noted that Ford graduated from college in May 1999 and had "been submitting resumes, but no job opportunities yet." (R. at 522.) X-rays, taken on May 17, 1999, revealed abnormalities of the third, fourth and fifth proximal interphalangeal joints with mild dorsal subluxation and defects of the distal aspect of the fourth and fifth proximal phalanges. (R. at 525.)

Chest x-rays, taken on October 11, 2000, were unremarkable. (R. at 786.) X-rays taken of Ford's right foot on October 31, 2000, revealed that Ford had hammertoe-like changes at the proximal interphalangeal joints of the second through the fifth toes. (R. at 785-86.) X-rays of the lumbosacral spine and

33

cervical spine, taken on April 2, 2001, revealed minimal spondylosis in the lumbosacral spine and evidence of spondylosis in the lower cervical region. (R. at 784-85.) X-rays of the wrists and shoulders, taken on April 2, 2001, revealed no significant abnormalities. (R. at 783-84.) Likewise, x-rays of both knees and both hands, taken on April 12, 2001; x-rays of the chest, taken on July 9, 2001; and x-rays of the right elbow, taken on August 16, 2001, revealed no significant abnormalities. (R. at 777-79, 781-82.) On April 12, 2001, a radiology report revealed that Ford's spine was somewhat kyphotic with narrowing of the disc space at C5-6 associated with minimal marginal spurs consistent with spondylosis. (R. at 788.)

On April 2, 2001, Ford underwent a mental disorders examination conducted by Dr. James Radford, M.D., a VA physician. (R. at 736-37.) Ford was diagnosed with dysthymia and his GAF was assessed at 50. (R. at 737.) On April 12, 2001, Ford underwent a cervical, thoracic and lumbar spine evaluation conducted by the VA.[21] (R. at 733-35.) Ford was diagnosed with cervical and lumbar spine mild degenerative disc disease. (R. at 735.) The examining physician, Dr. Judson McGowan, M.D., stated, "there does not appear to be specific orthopedic diagnoses to explain [Ford's] condition," and "to reiterate, based on the physical examination and the imaging studies, [Ford's] apparent level of pain and discomfort do not correlate well with his current exam." (R. at 735.)

---

[21]A similar examination of Ford's joints follows the spinal examination, but the majority of this examination report is missing from the record. (R. at 735.)

34

Ford was seen at the VA from April 18, 2001, through February 20, 2002. (R. at 698-732.) During this time period, Ford received individual and group psychotherapy. (R. at 698-701, 704-09, 713-16, 720-22, 726-27, 729-32.) Ford complained of, among other things, insomnia, (R. at 728), anxiety, (R. at 728), muscle tension, (R. at 728), elbow pain, (R. at 725), chronic recurrence of papules, (R. at 723-24), and chest pain, (R. at 719). He was diagnosed with dysthymia, (R. at 698-701, 705-09, 713-16, 720-22, 726-27, 729-32), folliculitis/dermatitis, (R. at 723), hyperlipidemia, (R. at 723), fibromyalgia, (R. at 723), atypical chest pain, (R. at 723), chronic gingivitis, (R. at 698, 720), morbid obesity, (R. at 710), dermatitis, (R. at 702), gout, (R. at 702), weight gain, (R. at 702), and asthma, (R. at 702). A diabetic foot exam on May 21, 2001, was normal visually, and revealed normal pulses and sensations. (R. at 729.) A diagnostic exercise stress test on August 16, 2001, revealed normal results. (R. at 718-19.) On December 19, 2001, Ford noted that he was not taking his medication on a regular basis, and stated that, "it's just that I don't care at times." (R. at 706.)

On August 10, 2002, Gary T. Bennett, Ph.D., conducted a psychological evaluation of Ford, at the request of Ford's counsel. (R. at 817-22.) Bennett noted that Ford was irritable, argumentative and impatient from time to time during the evaluation. (R. at 818.) Bennett stated that Ford put forth a good effort during the evaluation, but that Ford's mood was anxious and irritable and his affect ranged from edgy and irritable to friendly. (R. at 818.) Bennett found that Ford suffered from a long history of psychological disturbance, in addition to his longstanding medical problems. (R. at 821.) He found Ford's cognitive abilities to be relatively unimpaired, but found him to be emotionally unstable due to depression, anxiety and character traits consistent with individuals diagnosed with antisocial or

borderline personality disorders. (R. at 821.) Bennett determined that Ford's ability to interact with others was markedly impaired. (R. at 821.) Ford was diagnosed with recurrent and severe major depressive disorder without psychotic features, dysthymia, generalized anxiety disorder and personality disorder, not otherwise specified. (R. at 822.) His GAF was assessed at 45. (R. at 822.) Based on his evaluation, Bennett opined that Ford should receive disability benefits. (R. at 822.)

Bennett also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 823-25.) Bennett found that Ford had a good ability to function independently, to maintain attention and concentration and to understand, remember and carry out simple or detailed job instructions. (R. at 823-24.) Bennett also found that Ford had a fair ability to follow work rules, to deal with work stresses, to understand, remember and carry out complex job instructions, to maintain personal appearance and to demonstrate reliability. (R. at 824.) Bennett also found that Ford had a poor or no ability to relate to co-workers, to deal with the public, to use judgment with the public, to interact with supervisors, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 823-24.) Bennett noted that Ford had limited social skills, was emotionally labile, was easily angered and did not know how to express his anger in constructive ways. (R. at 824.) He also found that Ford could be expected to be absent from work about two days a month because of his impairments. (R. at 825.)

On November 6, 2002, Dr. Pramod Shah, M.D., completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 621-23.)

36

Dr. Shah found that Ford had a fair ability to follow work rules, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance and to demonstrate reliability. (R. at 621-22.) Dr. Shah also found that Ford had a poor or no ability to relate to co-workers, to deal with the public, to use judgment with the public, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex or detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 621-22.) Dr. Shah found that Ford could manage benefits in his own interest, and that he could be expected to be absent from work more than two days a month because of his impairments. (R. at 623.)

Ford was seen at the VA from September 9, 2003, through February 25, 2004. (R. at 583-612.) During this time period, Ford received individual and group psychotherapy. (R. at 583, 585, 589-93, 595, 597, 599, 601, 606). Ford complained of, among other things, allergies, (R. at 602), asthma, (R. at 602), and skin rash, (R. at 584). He was diagnosed with dysthymia, (R. at 583, 585, 589-93, 595, 597, 599, 601, 606), squamous papilloma, (R. at 605), asthma, (R. at 605), folliculitis, (R. at 605), chronic hyperkeratotic dermatitis, (R. at 605), diabetes mellitus, (R. at 588), hyperlipidemia, (R. at 588), and dermatitis, (R. at 588). A sleep study consultation on September 9, 2003, revealed that Ford had obstructive sleep apnea, for which he was given a continuous positive airway pressure machine. (R. at 611.) Ford underwent a colonoscopy on September 23, 2003. (R. at 607-08.) The colonoscopy revealed scattered colon diverticuli, hemorrhoids, a small sessile cecal cap polyp and a normal terminal ileum. (R. at 608.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 19, 2002, a second ALJ denied Ford's claim. (R. at 626-40.) The ALJ found that Ford met the disability insured status requirements of the Act for DIB purposes on October 15, 1995, and continued to meet them through September 30, 2001. (R. at 639.) The ALJ further found that Ford had not engaged in substantial gainful activity since October 15, 1995. (R. at 639.) The ALJ determined that the medical evidence established that Ford suffered from severe impairments, but he found that Ford did not have an impairment or combination of impairments listed or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 639.) The ALJ also found that Ford's subjective allegations were not entirely credible. (R. at 639.) The ALJ concluded that Ford retained the residual functional capacity to perform light work in a well-defined structured setting not requiring frequent ongoing interpersonal relationships, work which would allow him to alternate between standing and walking, work not requiring crouching or crawling, work not inconsistent with a limited ability to push, pull or hear and work not requiring exposure to any environmental irritants. (R. at 639.) Therefore, the ALJ found that Ford was unable to perform his past relevant work. (R. at 639.) The ALJ further found that Ford was a younger individual at the time of his alleged onset date but was now an individual closely approaching advanced age with more than a high school (or high school equivalent) education with no transferable skills. (R. at 639.) Although the ALJ found that Ford could not perform the full range of light work, using the Medical-Vocational Rules 202.14 and 202.21 as a framework, the ALJ found that there were a significant number of jobs in the national economy which Ford could perform, including jobs as a factory assembler or inspector. (R. at 640.) Thus, the ALJ found that Ford was not under a disability as defined by the Act, and

therefore, he was not eligible for DIB benefits. (R. at 640.) *See* 20 C.F.R. § 404.1520(f) (2007).

Ford argues the ALJ's decision was not based on substantial evidence within the record. (Brief In Support Of Plaintiff's Motion For Summary Judgment Prior Proceedings, ("Plaintiff's Brief"), at 3.) Specifically, Ford argues that the ALJ failed to provide a review of the medical evidence of record sufficient for this court to determine whether substantial evidence exists to support the ALJ's findings. (Plaintiff's Brief at 3-9.) Ford further argues that the ALJ failed to identify jobs consistent with Ford's age, education, work history and specific mental and physical limitations found by the ALJ. (Plaintiff's Brief at 9-12.) Lastly, Ford argues that the ALJ erred in relying on Dr. Robbins's opinion because it is contradicted by all the other evidence of the record. (Plaintiff's Brief at 12-17.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

40

Ford's first argument is that the ALJ failed to provide a review of the medical evidence of record sufficient for this court to determine whether substantial evidence exists to support the ALJ's findings. (Plaintiff's Brief at 3-9.) Because an ALJ has a duty to weigh the evidence in order to resolve any conflicts which might appear therein, I agree with Ford. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Indeed, the ALJ has a duty to indicate explicitly that he has weighed all relevant evidence, indicate the weight given to this evidence and sufficiently explain his rationale in crediting the evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). In this case, the ALJ did not explicitly indicate the weight given to all the relevant evidence, and therefore, I cannot determine if the findings are supported by substantial evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Before this court can determine whether substantial evidence supports an administrative determination, the Commissioner must discharge his duty to consider all relevant evidence and here, the Commissioner has not. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997) (citing *Jordan v. Califano*, 582 F.2d 1333, 1335 (4th Cir. 1978)). In this case, the ALJ failed to

41

sufficiently explain the weight given to many probative exhibits, including, among others, the limitations noted by Dr. McKnight in Exhibit 8F, the limitations noted by Hughson in Exhibit 7F, the limitations described by Dr. Dar in Exhibits 11F and 14F, the limitations noted by Padgett in Exhibit 1F and the limitations noted by Dr. Ahsanuddin in Exhibit 3F.[22]  The vocational expert testified, however, that the limitations noted in each of these exhibits would prevent Ford from performing work. (R. at 854-60.) The fact that the vocational expert testified that Ford would be unable to work based on the limitations noted in each of these exhibits makes clear that these exhibits are relevant to determining whether Ford is disabled. While the opinions of several healthcare professionals can be deemed less probative than that of one or two opinions that are deemed more credible based on the evidence as a whole, the ALJ failed to provide any analysis on the weight of many relevant and obviously probative exhibits.  Although the Appeals Council states that, "the opinion evidence of Drs. McKnight, Dar, Padgett, [Ahsanuddin] and Bennett is . . . not consistent with the evidence of the record as a whole," the Appeals Council fails to offer any explanation as to why the record as a whole is inconsistent with the opinions of these five healthcare professionals.  In light of this court's previous recognition that "[every] psychological or psychiatric evaluation contained in the record consistently reveals that Ford suffers from severe emotional difficulties," the Commissioner has failed to provide a sufficient explanation as to why Ford is not disabled. (R. at 669.)  As a result, this court cannot determine if the Commissioner's findings are supported by substantial evidence.  On remand, the Commissioner must sufficiently explain his rationale in crediting relevant and probative evidence, and not merely recite such evidence.

---

[22]All of these exhibits pertain to the period prior to September 30, 2001, the last date that Ford met the disability insured status requirements of the Act.  (R. at 639.)

42

Case 1:04-cv-00063-GMW-PMS   Document 38   Filed 04/24/08   Page 42 of 43   Pageid#: 235

The court expresses no opinion as to the conclusions that should be drawn from the evidence of record; however, Ford is entitled to have all relevant evidence properly considered and to have the Commissioner explain how he treated it in arriving at his conclusion. *Arnold*, 567 F.2d at 260. I find that substantial evidence does not exist in the record to support the Commissioner's finding, specifically with regard to Ford's mental residual functional capacity. Because the ALJ's and the Appeals Council's decisions do not provide this court with a sufficient explanation as to the weight given to relevant and probative evidence, I will not address Ford's other arguments at this time.

### V. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and this case will be remanded to the Commissioner for further consideration.

An appropriate order will be entered.

**ENTER**: This 24th day of April, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

43